This Opinion is a
Precedent of the TTAB

Hearing: February 8, 2018                    Mailed: August 16, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

——

Trademark Trial and Appeal Board

——

*In re i.am.symbolic, llc*

——

Serial No. 85916778

——

Jill M. Pietrini of Sheppard Mullin Richter & Hampton LLP,
    for i.am.symbolic, llc.

Brendan McCauley, Trademark Examining Attorney, Law Office 114,
    K. Margaret Le, Managing Attorney.

——

Before Kuhlke, Cataldo and Heasley,
    Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

i.am.symbolic, llc ("Applicant") seeks registration on the Principal Register of the

mark #WILLPOWER in standard characters for:

> Clothing, namely, bandanas, beachwear, blazers, blouses,
> dresses, earmuffs, formal wear in the nature of bridal
> dresses, cocktail dresses, evening dresses, gowns, evening
> tops, wraps, evening slacks, suits, tuxedos, evening jackets,
> formal shirts, vests, cummerbunds, ties, and formal shoes;
> gloves, hooded shirts, infantwear, jackets, jeans, jerseys,
> leggings, loungewear, mittens, neckwear, outerwear in the
> nature of wraps, pants, ponchos, scarves, shirts, shorts,
> skirts, sleepwear, socks, sports clothing, namely,
> bandanas, baseball uniforms, base layer bottoms and tops,

footwear, headwear, hooded sweatshirts, jackets, jerseys, pants, polo shirts, scarves, shorts, sports pants, sports shorts, sports shirts, sweatshirts, shirts, t-shirts, trousers, underpants, vests, warm-up suits; suits, sweaters, sweatpants, sweatshirts, swimwear, tank tops, trackpants, track suits, t-shirts, tunics, undergarments, vests, wind resistant jackets, outdoor winter clothing, namely, skiwear, coats, coveralls, ear muffs, gloves, jackets, mittens, overalls, overcoats, pants, parkas, sweaters, vests, and snowsuits; and yoga pants; footwear and insoles for footwear; belts; headwear; and wrist bands made of cloth, leather, or imitation leather, in International Class 25.[1]

The Trademark Examining Attorney refused registration of Applicant's mark under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's mark, when used in connection with the identified goods, so resembles the mark shown below, registered on the Principal Register for "Hats; Jackets; Pants; Shirts; Shoes," in International Class 25,[2] as to be likely to cause confusion, mistake or deception.



---

[1] Application Serial No. 85916778 was filed on April 27, 2013, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based upon Applicant's allegation of a *bona fide* intention to use the mark in commerce.

[2] Registration No. 3765222, issued on March 23, 2010, Section 8 declaration accepted. The word "WEAR" is disclaimed. "The mark consists of two offset, identical mountain peaks with the stylized text 'WILLPOWER WEAR' below. To the right there is the stylized text 'Have the will...'."

When the refusal was made final, Applicant appealed and requested reconsideration. Upon the denial of the request for reconsideration, the appeal was resumed and briefs were filed. We affirm the refusal to register.

## I.    Likelihood of Confusion

When the question is likelihood of confusion, we analyze the facts as they relate to the list of relevant factors set out in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*du Pont*") (cited in *B&B Hardware, Inc. v. Hargis Ind., Inc.*, 135 S. Ct. 1293, 113 USPQ2d 2045, 2049 (2015)). *See also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). Even within the *du Pont* list, only factors that are "relevant and of record" need be considered. *M2 Software, Inc. v. M2 Commc'ns, Inc.*, 450 F.3d 1378, 78 USPQ2d 1944, 1947 (Fed. Cir. 2006); *ProMark Brands Inc. v. GFA Brands, Inc.*, 114 USPQ2d 1232, 1242 (TTAB 2015) ("While we have considered each factor for which we have evidence, we focus our analysis on those factors we find to be relevant."). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1747 (Fed. Cir. 2017) ("The likelihood of confusion analysis considers all DuPont factors for which there is record evidence but 'may focus … on dispositive factors, such as similarity of the marks and relatedness of the goods.'") (quoting *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 303 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002)); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the

cumulative effect of differences in the essential characteristics of the goods and differences in the marks.").

### A. Similarity of the Goods/Channels of Trade/Consumers

With regard to the goods, channels of trade and classes of consumers, we must make our determinations based on the identifications of goods in the application and cited registration. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014); *Hewlett-Packard Co. v. Packard Press Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002); *Octocom Sys., Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990).

Applicant's "jackets," and "pants" are identical to Registrant's "Jackets" and "Pants." Applicant's "formal shirts," "hooded shirts," "formal shoes," "outerwear in the nature of … pants, shirts," "sports clothing, namely, … footwear, headwear, jackets, pants, polo shirts … sports pants … sports shirts … shirts," "footwear," and "headwear" encompass or are encompassed within Registrant's "Hats; Jackets; Pants; Shirts; Shoes." Thus, these goods are legally identical. *Tuxedo Monopoly, Inc. v. General Mills Fun Group*, 648 F.2d 1335, 209 USPQ 986 (CCPA 1981) (it is sufficient for a finding of likelihood of confusion if relatedness is established for any item encompassed by the identification of goods within a particular class in the application); *Inter IKEA Sys. B.V. v. Akea, LLC*, 110 USPQ2d 1734, 1745 (TTAB 2014); *Baseball America Inc. v. Powerplay Sports Ltd.*, 71 USPQ2d 1844, 1847 n.9 (TTAB 2004).

We must presume that Applicant's and Registrant's goods will be sold in the same channels of trade and will be bought by the same classes of purchasers, because the goods are identical and legally identical in part and there are no limitations as to channels of trade or classes of purchasers in either the application or cited registration. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (even though there was no evidence regarding channels of trade and classes of consumers, the Board was entitled to rely on this legal presumption in determining likelihood of confusion). *See also Hewlett-Packard Co. v. Packard Press Inc.*, 62 USPQ2d 1001; *Canadian Imperial Bank v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987); *Genesco Inc. v. Martz*, 66 USPQ2d 1260 (TTAB 2003); *In re Smith and Mehaffey*, 31 USPQ2d 1531 (TTAB 1994).

Applicant explains that its "founder is Will Adams, who is known globally under his stage name WILL.I.AM as the front man for the Grammy Award winning and platinum winning musical group The Black Eyed Peas and as a soloist in his own right [and] Mr. Adams' fourth music album is titled '#willpower.'" 66 TTABVUE 3. Applicant argues "[t]he goods are targeted to, and purchased by, wholly different consumers, namely, consumers seeking merchandise in connection with Applicant's album and with Applicant. Because each party's respective goods are not marketed in such a way that they would be encountered by the same persons in situations that would create the incorrect assumption that they originate from the same source, it is highly unlikely that consumers would confuse Applicant's goods and Registrant's goods." 70 TTABVUE 10. Applicant's arguments are not persuasive, because we must

consider the goods as they are identified. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, 110 USPQ2d at 1161. Their respective actual uses and marketing are not reflected in the identification of goods in the application or the cited registration. While the Applicant may be associated with William Adams, there is nothing in the application that limits the marketing of the goods to methods that would unmistakably associate the goods with him, his persona, or his album.

Moreover, such a restriction would not obviate a finding that the trade channels and classes of consumers overlap. The Federal Circuit considered a restriction limiting goods to the marketing of the same individual's persona in an identification of goods in *In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744 (Fed. Cir. 2017), *aff'g* 116 USPQ2d 1406 (TTAB 2015). In that case the identification of goods included the wording "associated with William Adams, professionally known as 'will.i.am'" and Applicant argued that its mark would be perceived as identifying Mr. Adams, and that this perception would, in some way, affect the marketing of the goods and the customers to whom they are directed. The Board rejected this argument because the record did not establish that Mr. Adams was widely known by the mark "i.am" and, even if the Board "accept[ed] Applicant's contention that Mr. Adams is known by 'i.am' and that this brand has gained notoriety, the statute still 'protects the registrant and senior user from adverse commercial impact due to use of a similar mark by a newcomer.'" *In re i.am.symbolic, llc*, 116 USPQ2d at 1410 (quoting *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1690 (Fed. Cir. 1993)). The Court of Appeals for the Federal Circuit affirmed the Board's decision, explaining:

We agree with the PTO that Symbolic has failed to show reversible error in the Board's determination that the will.i.am restriction does not impose a meaningful limitation in this case for purposes of likelihood of confusion analysis. It is well established that the Board may not read limitations into an unrestricted registration or application. *See SquirtCo v. Tomy Corp.*, 697 F.2d 1038, 1043 [216 USPQ 937] (Fed. Cir. 1983) ("There is no specific limitation here, and nothing in the inherent nature of SquirtCo's mark or goods that restricts the usage of SQUIRT for balloons to promotion of soft drinks. The board, thus, improperly read limitations into the registration."); *see also* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark upon the principal register … [is] prima facie evidence … of the *owner's exclusive right to use the registered mark* in commerce on or in connection *with the goods* or services *specified in the certificate, subject to any conditions or limitations stated in the certificate."* (emphases added)). However, where both the applicant's and the registrant's identifications of goods recite limitations, those limitations may be considered in analyzing the *DuPont* factors. *See M2 Software*, 450 F.3d at 1382-83. Here, the registrations do not contain an express limitation, and, for the reason discussed in more detail below with respect to the *DuPont* factors, the will.i.am restriction does not distinguish the mark sufficiently from the registrants' marks to overcome the evidence of likelihood of confusion.

*In re i.am.symbolic, llc*, 123 USPQ2d at 1748.

The same conclusion holds true here. In view thereof, the *du Pont* factors concerning the goods, channels of trade and classes of consumers weigh in favor of a finding of likelihood of confusion.

## B.    *Similarity/Dissimilarity of the Marks*

Under this factor, we compare Applicant's and Registrant's marks "in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin*, 396 F.3d 1369, 73 USPQ2d 1689, 1691

(Fed. Cir. 2005) (quoting *du Pont*, 177 USPQ at 567). The proper perspective on which the analysis must focus is on the recollection of the average customer, who retains a general rather than specific impression of marks. *Geigy Chem. Corp. v. Atlas Chem. Indus., Inc.*, 438 F.2d 1005, 169 USPQ 39, 40 (CCPA 1971); *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1438 (TTAB 2012); *Winnebago Indus., Inc. v. Oliver & Winston, Inc.*, 207 USPQ 335, 344 (TTAB 1980); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975). Because the goods are clothing without any restrictions or limitations as to price point or classes of consumers, as discussed above, the average customer is an ordinary consumer of the respective goods.

Finally, when the goods are identical or virtually identical, as we have in this case, the degree of similarity between the marks necessary to support a determination that confusion is likely declines. *See Bridgestone Americas Tire Operations, LLC v. Fed. Corp.*, 673 F.3d 1330, 102 USPQ2d 1061, 1064 (Fed. Cir. 2012); *In re Viterra*, 101 USPQ2d at 1908; *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1260 (Fed. Cir. 2010); *Century 21 Real Estate Corp. v. Century Life of Am.*, 970 F.2d 874, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992); *In re Max Capital Grp. Ltd.*, 93 USPQ2d 1243, 1248 (TTAB 2010).

Looking at the marks in their entireties, the shared term WILLPOWER stands out as the most dominant element of Applicant's mark, conveying a stronger commercial impression than the # symbol. In addition, with regard to Registrant's mark, generally it is "the verbal portion of a word and design mark [that] likely will be the dominant portion." *In re Viterra*, 101 USPQ2d at 1911. *See also CBS Inc. v.*

*Morrow*, 708 F.2d 1579, 218 USPQ 198, 200 (Fed. Cir. 1983) ("[T]he verbal portion of the mark is the one most likely to indicate the origin of the goods to which it is affixed."). The design of stylized mountains in Registrant's mark does not overwhelm, detract from, or change the commercial impression of, the wording WILLPOWER WEAR and HAVE THE WILL, but rather serves as an upper border that attracts the eye to the wording WILLPOWER WEAR. The mountains also resemble stylized W's, focusing attention on the alliterative wording WILLPOWER WEAR, immediately beneath them, as the source identifier. The slogan HAVE THE WILL reinforces the word WILLPOWER. In addition, WILLPOWER WEAR "comes across as a single, unified component of the mark" and HAVE THE WILL "as a separate part of the mark." *In re The United States Shoe Corp.*, 229 USPQ 707, 709 (TTAB 1985) (finding CREST CAREER IMAGES and CAREER IMAGE confusingly similar). The descriptive, disclaimed word WEAR is less significant and does not detract from the dominance of the term WILLPOWER in creating the mark's commercial impression. *In re Dixie Rests., Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533-34 (Fed. Cir. 1997) (affirming TTAB's finding that "DELTA," not the disclaimed generic term "CAFE," is the dominant portion of the mark THE DELTA CAFE).

With regard to the appearance of the marks, Applicant argues that "a consumer who sees the two marks in the marketplace, which appear dramatically and substantially different in appearance, would plainly conclude that the goods come from distinct sources. The 'impact' of the appearance portion of the mark, both semantically and from a design perspective, is that they are, in fact distinguishable."

66 TTABVUE 10. However, the test is not whether the marks can be distinguished in a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods and/or services offered under the respective marks is likely to result. *Midwestern Pet Foods, Inc. v. Societe des Produits Nestle S.A.*, 685 F.3d 1046, 103 USPQ2d 1435, 1440 (Fed. Cir. 2012). Further, the marks "'must be considered … in light of the fallibility of memory ….'" *In re St. Helena Hosp.*, 113 USPQ2d at 1085 (quoting *San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 196 USPQ 1 (CCPA 1977)). As found above, the focus of Registrant's mark is on the word WILLPOWER, which would be retained by the consumer more than the other elements.

Applicant also argues that:

> Applicant selected the phrase WILLPOWER in connection with the # in order to convey a completely different connotation than "energetic determination." William Adams' stage name is will.i.am. (*See* Mar. 14, 2017 Request for Reconsideration, TSDR Ex. A.) Because of the uniqueness of this stage name, Mr. Adams playfully uses different portions of his name in many different contexts. For example, he has gone by "Will 1X" and offers a variety of goods and services, *including clothing*, under the "I.Am" portion of his stage name. (*Id*.). The evidence Applicant attached to its Request for Reconsideration clearly establishes that Mr. Adams and his music are closely associated with his successful career as a fashion influencer, designing notable pieces of clothing. (*Id*.) Thus, the selection of #WILLPOWER is simply an extension of this trend and is meant to play on the first portion of his stage name, "Will." It is thus, plainly, Will's "power." When combined with the hashtag, which he has uniquely used for his album, merchandise, and songs, the connotation to the consumer is clear consumers are participating in the

experience that is Will's power, or #WILLPOWER. Such use has no semblance to the supposedly spirit-lifting "energetic determination" conveyed by Registrant's mark, which is only reinforced by the inclusion of the design elements and additional language of HAVE THE WILL. The Examining Attorney is right that the design element and additional matter in Registrant's mark reinforces that connotation, which lines up with the common use of the term "willpower." However, the same cannot be said for Applicant's mark. When viewed in its entirety, the meanings are plainly different, especially when the use of the # is present and given the recognition of #WILLPOWER with will.i.am and his musical endeavors. That use, in connection with the actual source of the goods (Applicant) creates distinct commercial impressions in the minds of the consumer. Thus, when the consumer approaches these marks in the marketplace, or references them to another, it is clear that the additional subject matter in both marks, "have the will" and "#," or "hashtag," will convey very distinct meanings in the mind of that consumer so that they understand plainly that the goods come from different sources.

66 TTABVUE 17.

However, we must also consider the impact of Applicant's mark on consumers who are not familiar with that particular album or Mr. Adams' persona. The relevant trade channels and classes of consumers for the identified goods include all ordinary channels of trade (regardless of any association with Mr. Adams or his album) and all customers (regardless of any familiarity with Mr. Adams or his album) for such goods. These trade channels include general clothing stores, both online and brick and mortar; they are not restricted to Applicant's and Registrant's respective websites. In view thereof, we must consider consumers of the goods who would simply take the ordinary meaning of the word WILLPOWER from Applicant's mark #WILLPOWER. Thus, both marks present the same connotation of "ability to control

yourself" "strong determination that allows you to do something difficult"[3] or "the strength of will to carry out one's decisions, wishes, or plans."[4]

In discounting the ability of the hash character (#) to meaningfully distinguish Applicant's mark from the registered mark, the Examining Attorney argues that:

> Applicant's use of a hashtag before the term "WILLPOWER" does not obviate the similarity between the marks. Hashtags are used on social-networking sites to identify or search for a keyword or topic of interest. *See* [Trademark Manual of Examining Procedure] TMEP § 1202.18 [Oct. 2017]. Because a hashtag will usually be perceived as part of an online social media search term, a hashtag generally serves no source-indicating function and adding such symbol or term to an otherwise unregistrable mark typically does not render the mark registrable. TMEP § 1202.18; *cf. In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1177, 71 USPQ2d 1370, 1374 (Fed. Cir. 2004) (holding that the addition of a top-level domain to an otherwise unregistrable mark does not typically add any source-identifying significance); *Interactive Prods. Corp. v. a2z Mobile Office Solutions, Inc.*, 326 F.3d 687, 696-97, 66 USPQ2d 1321, 1327-28 (6th Cir. 2003) (holding that the post-domain path of a URL does not typically signify source). In the present case, the hashtag portion of applicant's mark will be perceived as part of an online social media campaign related to the word "WILLPOWER" and does not necessarily provide any additional source indication. For this reason, the essence of applicant's mark is "WILLPOWER" which is the overall commercial impression of registrant's mark. In addition, as the hashtag is used as part of online social media campaigns, consumers may perceive applicant's mark as the social media campaign derivative of registrant's mark.
>
> …

---

[3]   MERRIAM-WEBSTER DICTIONARY (www.merriam-webster.com) April 4, 2017, Reconsideration Letter at 5-7.

[4]   THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (ww.ahdictionary.com) April 4, 2017, Reconsideration Letter at 14-15.

> The use of the hash tag symbol in applicant's mark calls to mind the social media significance of the use of the term "WILLPOWER" which is significant given that registrant's mark contains the similar wording "WILLPOWER". Indeed, the evidence submitted by applicant shows that applicant advertises and sells products under the "#WILLPOWER" mark in connection with his work as a recording artist. March 17, 2017, Paper Correspondence Incoming, (Request for Reconsideration), TSDR pp. 14-81 (i.e. Exhibits A-G). Applicant is correcting [sic] in submitting that there is no evidence that registrant sells merchandise online or has an online presence of record. However, this does not negate the line of reasoning that a consumer familiar with registrant's "WILLPOWER WEAR" line of clothing maybe [sic] confused that applicant's mark is part of a social media campaign on the part of registrant despite the fact that as applicant contends applicant is a famous and world renowned recording artist. This is particularly true given that the overriding concern is not only to prevent buyer confusion as to the source of the goods, but to protect the registrant from adverse commercial impact due to use of a similar mark by a newcomer.

69 TTABVUE 10, 21-22.

A hashtag is "a word or phrase that starts with the symbol # and that briefly indicates what a message (such as a tweet) is about."[5] According to Wikipedia, a hashtag "is a type of label or metadata tag used on social network and microblogging services which makes it easier for users to find messages with a specific theme or content. Users create and use hashtags by placing the hash character # (also known as the number sign or pound sign) in front of a word or unspaced phrase, either in the main text of a message or at the end. Searching for that hashtag will yield each

---

[5] MERRIAM-WEBSTER DICTIONARY (https://www.merriam-webster.com/dictionary/hashtag), Reconsideration Letter at 20.

message that has been tagged with it."[6] As such, the use of a hashtag in the social media context plays a functional role in facilitating searches on social media platforms.[7]

As the Examining Attorney points out, TMEP § 1202.18 discusses the impact of the addition of a # character to a word. We agree that, as stated there, a hash symbol or the word HASHTAG generally adds little or no source-indicating distinctiveness to a mark. We find, in this case, the hash symbol does not have source-indicating distinctiveness and at most simply appears as the social media tool to create a metadata tag.

---

[6] (https://en.wikipedia.org/wiki/Hashtag) April 4, 2017 Reconsideration Letter at 27. The Board has considered evidence taken from Wikipedia, bearing in mind the limitations inherent in this reference work, so long as the non-offering party had an opportunity to rebut that evidence. *In re Bay State Brewing Co.*, 117 USPQ2d 1958, 1959 n.3 (TTAB 2016). The Board has been reluctant to consider Wikipedia excerpts submitted with the denial of a request for reconsideration, reasoning that although the opportunity to request remand to submit new evidence is available to applicants, the application record should be complete prior to the filing of an ex parte appeal. However, in the last several years excerpts from Wikipedia have frequently been submitted during the prosecution of an application and have rarely been rebutted by an updated excerpt. In view thereof, we will now consider such excerpts submitted with a denial of a request for reconsideration, keeping in mind that an applicant has the opportunity to rebut such entry, when necessary, by requesting remand to submit rebutting evidence.

[7] Placing the hash character in front of a word is also used "to informally express context around a given message, with no intent to categorize the message for later searching, sharing, or other reasons. … This can help express contextual cues or offer more depth to the information that appears with the hashtag." April 4, 2017 Reconsideration Letter at 29. Hashtags may be "used to express personal feelings and emotions. For example, with 'It's Monday!! #excited #sarcasm' in which the adjectives are directly indicating the emotions of the speaker." *Id.* However, in such a case the hashtag simply emphasizes the sentiment conveyed by the term that follows, similar to the function of an exclamation point, and does not significantly alter the commercial impression of the wording. *Cf. In re Litehouse, Inc.*, 82 USPQ2d 1471, 1474 (TTAB 2007).

Applicant particularly relies on *In re Covalinski*, 113 USPQ2d 1166, 1169 (TTAB 2014) wherein the Board found the mark sufficiently different to avoid likely confusion with the standard character mark RACEGIRL. The mark in that case included prominent double RRs, the addition of the term "redneck," and the remainder of the common word RACEGIRL was displayed with ACE in tiny letters that were difficult to notice. The Board found that the commercial impression of Applicant's mark was dominated by the double-letter RR configuration. Here, there is nothing in either Applicant's mark or Registrant's mark that is so prominent as to diminish the significance of the common word WILLPOWER. We acknowledge that, as in *Covalinski,* consumers would likely encounter the marks in a retail setting on hang tags or neck labels and in that context the visual impression of the mark is likely to be more important. *Id.* at 1168. However, even on a label the word WILLPOWER in Registrant's mark cannot be missed.

Another decision relied on by Applicant, *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059 (Fed. Cir. 2003), does not persuade us of a different result. In that case, the Court considered the marks depicted below:

 

The Court made the following observations regarding the factor of the similarity of the marks:

> Although we uphold the Board's finding that the two marks are generally similar, principally because they both use the term "Blue Moon," we note that similarity is not a binary factor but is a matter of degree. Because there are significant differences in the design of the two marks, the finding of similarity is a less important factor in establishing a likelihood of confusion than it would be if the two marks had been identical in design or nearly indistinguishable to a casual observer.

*Id.* at 1062.

The Court's conclusion that confusion was unlikely relied heavily on its determination that the Board's finding that beer and restaurant services were related was in error. Here, we have goods that are legally identical in part, less prominent design elements in Registrant's mark, and only the addition of the hash character in Applicant's mark.

The dominant element in the marks is the word WILLPOWER and it is identical in sound and meaning in both marks. Although the additional wording and design element in Registrant's mark and the hash character in Applicant's mark present dissimilarities, they are not sufficient to overcome the strong similarities in

connotation and overall commercial impression that the marks share due to the identity of the dominant element, WILLPOWER. We find the similarities outweigh the dissimilarities.

In the end, "we find that the marks, when used in connection with the goods as set forth in the identifications of goods, would be perceived similarly." *In re i.am.symbolic, llc*, 116 USPQ2d at 1411. This *du Pont* factor weighs in favor of a likelihood of confusion.

### C. The Number and Nature of Similar Marks in Use on Similar Goods

Applicant argues that the word "willpower" is weak in the field of clothing, and should not be accorded a broad scope of protection. In support of this argument, Applicant points to five examples of third-party use of the term "willpower" as part of a mark. The relevant portions are shown below:

> Website for the Willpower online store specializing in running clothing;[8]

---

[8] March 17, 2017, Response Exhibit H at 87 (willpower-running.com). The prices for the clothing are quoted in Euros, indicating that this is not a United States based online store, and we lack evidence indicating whether U.S. consumers were likely exposed to the website or can purchase clothing from the website, which reduces its probative value in determining U.S. consumer perception of the term WILLPOWER for clothing. However, we do not wholly discount it, as U.S. consumers may have some exposure to such websites retrieved from an Internet search. *In re Well Living Lab Inc.*, 122 USPQ2d 1777, 1781 n.10 (TTAB 2017) ("We evaluate the probative value of foreign information sources on a case-by-case basis.").



Website for the Title Nine online store featuring a Will Power jacket;[9]



_____

[9] *Id.* Exhibit I at 103 (www.titlenine.com).

Website for the Willpower Method online store displaying a The Willpower Method hoodie;[10]



Website for the Overstock online store displaying Carlos Santana's women's "Willpower" dress shoes with the notation "Out of Stock";[11] and

---

[10] *Id.* Exhibit J at 126 (willpowermethod.com).

[11] *Id.* Exhibit K at 129 (www.overstock.com).



Website for the Will to Choose online store discussing the "remaining inventory" of a Will Power T-shirt for ladies available for purchase "at a discounted rate";[12]



---

[12] *Id.* Exhibit L at 135 (www.thewilltochoose.com).

Under the sixth *du Pont* factor, we consider "[t]he number and nature of similar marks in use on similar goods." *du Pont*, 177 USPQ at 567. Evidence of third-party use bears on the strength or weakness of a registrant's mark. *In re i.am.symbolic, llc* 123 USPQ2d at 1751. If the evidence establishes that the consuming public is exposed to third-party uses of similar marks for similar goods, it "is relevant to show that a mark is relatively weak and entitled to only a narrow scope of protection." *Palm Bay v. Veuve Clicquot*, 73 USPQ2d at 1693.

While Applicant has not presented specific evidence concerning the extent and impact of these uses, it nevertheless presented "evidence of these marks being used in internet commerce" for certain of the clothing items identified in the application and cited registration. *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. v. Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 982 (2016); *see also Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1072 (TTAB 2011) (internet printouts "on their face, show that the public may have been exposed to those internet websites and therefore may be aware of the advertisements contained therein").

These five uses of WILLPOWER, while somewhat probative, are insufficient to "show that customers … have been educated to distinguish between different … marks on the basis of minute distinctions." *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015) (internal quotations omitted). The third-party evidence here is far less in quantity and quality than that in *Juice Generation*, which included at least 26 uses or registrations of the same phrase for

restaurant services, *Juice Generation*, 115 USPQ2d at 1673 n.1, or in *Jack Wolfskin* where there were at least fourteen, 116 USPQ2d at 1136 n.2.

On balance, we find the evidence of third-party use of WILLPOWER for clothing articles is insufficient to demonstrate that registrant's mark is weak or entitled to a narrow scope of protection. We treat this factor as neutral in our analysis.[13]

## II.   Balancing of Factors

When we consider that the goods, channels of trade and consumers are in part legally identical, and the marks are similar in appearance, connotation, and overall commercial impression based on the shared word WILLPOWER, the meaning of which is reinforced by the other wording in Registrant's mark, we find that confusion is likely.

**Decision**: The refusal to register Applicant's mark is affirmed.

---

[13] We add that even if we had found the scope of the word WILLPOWER in the field of clothing to be somewhat narrowed based on this evidence, so as to slightly favor Applicant, it would not change the result.