This Opinion is a
Precedent of the TTAB

Mailed: July 9, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Yarnell Ice Cream, LLC*

_____

Serial No. 86824279

_____

Daniel L. Kegan and Jay Giusti of Kegan & Kegan, Ltd.,
    for Yarnell Ice Cream, LLC.

Melissa Sturman, Trademark Examining Attorney, Law Office 125,
    Mark Pilaro, Managing Attorney.

_____

Before Kuhlke, Bergsman, and Larkin,
    Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

Yarnell Ice Cream, LLC ("Applicant") seeks registration on the Principal Register of the proposed mark SCOOP in standard characters for goods ultimately identified as "frozen confections and ice cream promoted and distributed by a mascot named SCOOP at product promotions and distributions of the frozen confections and ice cream," in International Class 30.[1]

---

[1] Application Serial No. 86824279 was filed on November 18, 2015 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), on the basis of Applicant's claim of first use of the proposed mark and first use in commerce since at least as early as February 1, 2012. As

The Trademark Examining Attorney has refused registration of Applicant's proposed mark on three grounds:

1. Under Sections 1, 2, 3, and 45 of the Trademark Act, 15 U.S.C. §§ 1051, 1052, 1053, and 1127, on the ground that the applied-for mark fails to function as a mark for the goods identified in the application;

2. Under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the ground that the applied-for mark is merely descriptive of the goods identified in the application and has not acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f); and

3. Under Sections 1 and 45 of the Trademark Act, 15 U.S.C. §§ 1051 and 1127, on the ground that Applicant's specimens do not show use of the applied-for mark in commerce in connection with the goods identified in the application.

When the Examining Attorney made the refusal final, Applicant appealed and requested reconsideration, 4 TTABVUE,[2] which was denied. 5 TTABVUE. The appeal is fully briefed. We affirm the refusal to register on all three grounds.

---

discussed below, the identification of services was first amended during prosecution and then again on appeal.

[2] Citations to the briefs and other docket entries in this opinion refer to TTABVUE, the Board's online docketing system. *Turdin v. Tribolite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear.

## I.   Prosecution and Procedural History

We summarize below the prosecution history of the application and the procedural history of the appeal because they provide useful background for our analysis of the several grounds for refusal.

### A. Prosecution History and Record on Appeal

Applicant initially sought registration of its proposed mark for "frozen confections; ice cream" based on the specimen reproduced below:



Applicant described its specimen as a "[p]hoto of mascot SCOOP with Applicant's ice cream, in one of his many public appearances with Applicant's ice cream."[4]

---

[3] November 18, 2015 Application at TSDR 3. All citations to the application file record in this opinion are to pages in the Trademark Status & Document Retrieval ("TSDR") database of the United States Patent and Trademark Office ("USPTO").

[4] *Id.* at TSDR 1.

The Examining Attorney issued a first Office Action refusing registration on three grounds: (1) likelihood of confusion with multiple registered SCOOP-formative marks; (2) mere descriptiveness; and (3) the insufficiency of Applicant's specimen.[5] The Examining Attorney made of record a dictionary definition of the word "scoop,"[6] and webpages showing the use of the word "scoop" in connection with ice cream.[7]

Applicant responded by making of record materials regarding third-party company spokespersons "The Maytag Repairman," "The Marlboro Man," Dos Equis beer's "Most Interesting Man in the World," and the "Culligan Man,"[8] pages from the USPTO's Trademark Electronic Search System ("TESS") database regarding third-party registrations of certain mascot marks,[9] a list of the scheduled public appearances of the mascot Scoop from 2012-2016,[10] a Wikipedia entry on the "foot" unit of measure,[11] multiple other photographs or other depictions of, or references to, the mascot, including photographs at appearances at stores or events,[12] a video of an appearance by the mascot,[13] and point-of-sale displays, including displays of other characters and what Applicant described in its main appeal brief as a "live sampling

---

[5] March 11, 2016 Office Action at TSDR 1.

[6] *Id.* at TSDR 17-28 (MERRIAM-WEBSTER DICTIONARY).

[7] *Id.* at TSDR 29-36.

[8] August 4, 2016 Response to Office Action at TSDR 2-23, 27-31.

[9] *Id.* at TSDR 24-26, 32-37.

[10] *Id.* at TSDR 48-51.

[11] *Id.* at TSDR 52-55. Applicant offered this entry to show that historically the human body has been used as a basis for units of measurement.

[12] *Id.* at TSDR 56-97.

[13] *Id.* at TSDR 98.

person." 7 TTABVUE 17.[14] Applicant also stated that "SCOOP is not the name of a particular living individual."[15]

The Examining Attorney then issued a second Office Action making final the three grounds for refusal.[16] The Examining Attorney made of record webpages regarding the use of the word "scoop" to measure a serving portion of ice cream,[17] and third-party registrations of marks in which the exclusive right to use the words "scoop" or "scoops," or a pictorial equivalent, were disclaimed.[18]

### B. Procedural History of Appeal

Applicant appealed on all three grounds of the final refusal, 1 TTABVUE, and requested reconsideration. 4 TTABVUE. In its request, Applicant claimed that its proposed mark had acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f). *Id.* at 7. Applicant made of record pages from a book entitled BRAND MASCOTS,[19] third-party registrations from the TESS database, and webpages, regarding the "Burger King" and "Beanie" mascots,[20] a schedule of the appearances of the mascot Scoop from 2012-2016, and photographs taken at some of the

---

[14] *Id.* at TSDR 99-117.

[15] *Id.* at TSDR 118.

[16] August 26, 2016 Final Office Action at TSDR 1.

[17] *Id.* at TSDR 17-30.

[18] *Id.* at TSDR 31-77.

[19] 4 TTABVUE 15-18.

[20] *Id.* at 19-38.

appearances,[21] and the declaration of Rob Bell ("Bell Decl."), a principal at Applicant's advertising agency, in support of Applicant's acquired distinctiveness claim.[22]

The Examining Attorney denied Applicant's request for reconsideration, 5 TTABVUE, and the appeal was resumed. 6 TTABVUE. After Applicant filed its main brief, 7 TTABVUE ("Initial Brief"), the Examining Attorney requested suspension of the appeal and a remand of the application to examine Applicant's claim of acquired distinctiveness, to issue a new refusal, and to supplement the record. 9 TTABVUE 1-2. The Board suspended the appeal and remanded the application. 10 TTABVUE 1-2.

Following remand, the Examining Attorney issued a new non-final Office Action in which she continued the likelihood of confusion, mere descriptiveness, and specimen refusals, and issued new refusals that SCOOP failed to function as a trademark and that Applicant's showing of acquired distinctiveness was insufficient.[23] In connection with the new ground of failure to function, the Examining Attorney made of record webpages that she asserted showed that the term "scoop" was widely used in connection with ice cream to refer to a unit of measurement for the goods, which indicated to the Examining Attorney that "consumers will perceive this term merely as informational matter indicating the applicant offers a serving or scoop of ice cream."[24] The Examining Attorney also noted that the term, as displayed

---

[21] *Id.* at 39-94.

[22] *Id.* at 130-32.

[23] July 17, 2017 Office Action at TSDR 1.

[24] *Id.*

on the specimen, would not be perceived as indicating the source of Applicant's ice cream, but rather to identify Applicant's mascot, and thus "does not show a direct association between the applied-for mark and applicant's identified goods."[25]

Applicant responded to the new non-final Office Action by proposing to amend its identification of goods from "frozen confections; ice cream" to "frozen confections, ice cream, as promoted or distributed by a mascot named SCOOP, at product promotions and distributions of Applicant's ice cream and frozen confections,"[26] and making of record an email from a member of the public requesting Applicant's permission to use what the email described as "Yarnells [sic] trademark" in the phrase "Getting scoops like Yarnell" on t-shirts for members of a high school football team.[27]

The Examining Attorney then issued a new final Office Action in which she withdrew the Section 2(d) refusal, but maintained the other grounds for refusal.[28] She made of record an additional dictionary definition of the word "scoop,"[29] and additional webpages regarding use of the words "scoop" and "scoops" in connection with ice cream.[30] In response to Applicant's proposed amended identification of goods, the Examining Attorney issued an advisory stating that an "applicant should not use its own registered or unregistered mark in an identification of goods and/or services,"

---

[25] *Id.*

[26] January 12, 2018 Response to Office Action at TSDR 1.

[27] *Id.* at TSDR 2-3.

[28] February 15, 2018 Final Office Action at TSDR 1 (11 TTABVUE).

[29] *Id.* at TSDR 2.

[30] *Id.* at TSDR 3-16.

and that "[i]dentifications of goods and/or services should generally be comprised of generic everyday wording for the goods and/or services, and exclude proprietary or potentially-proprietary wording."[31] The appeal resumed, and Applicant was granted leave to file a supplemental brief on the new issues raised in the new final refusal. 12 TTABVUE. Applicant addressed the Section 2(f), failure-to-function, and mere descriptiveness grounds in a supplemental brief. 13 TTABVUE 2-7 ("First Supplemental Brief").

Following the filing of the Examining Attorney's brief, 15 TTABVUE, and Applicant's reply brief, 16 TTABVUE, the Board, acting sua sponte, remanded the application to the Examining Attorney to consider the presence of the word "Applicant's" in Applicant's amended identification of goods. 19 TTABVUE 3-5.[32] On remand, Applicant agreed to delete the word "Applicant's" from its amended identification of goods and further amended the identification to read "frozen confections and ice cream promoted and distributed by a mascot named SCOOP at product promotions and distributions of the frozen confections and ice creams."[33] The Examining Attorney entered an Examiner's Amendment accepting the amended

---

[31] Id. at TSDR 1. Section 1402.09 of the TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") (Oct. 2018) states that "[g]enerally, an applicant should not use its own registered or unregistered mark in an identification of goods or services," but that if an applicant chooses to do so, "the applicant should be careful to use the mark as an adjective modifying the generic name of the goods or services." Applicant's use of SCOOP in the amended identification is not "as an adjective modifying the generic name of the goods or services," but the Examining Attorney's advisory did not focus on this preferred practice.

[32] Section 1402.09 of the TMEP instructs examining attorneys that "the words 'applicant' or 'registrant' must not appear in the identification of goods or services."

[33] March 6, 2019 Examiner's Amendment at TSDR 1.

identification, but maintaining the grounds for refusal, and the Board resumed the appeal.[34]

On resumption of the appeal, Applicant was given leave to file another supplemental brief limited to the impact, if any, of the deletion of the word "Applicant's" from its identification of goods, and the Examining Attorney was given leave to file "a brief limited to responding to Applicant's supplemental brief." 20 TTABVUE 1-2. In response, Applicant filed a second supplemental brief stating that "the amended goods identification, deleting the word 'Applicant's', has no impact on any of the objections raised by the Examiner, nor on any of the issues raised by Applicant," *id.* at 2, obviating the need for a response from the Examining Attorney. Applicant noted the absence of a response from the Examining Attorney in a subsequent and final filing, stating that the "matter is therefore fully briefed and appears ripe for the Board's consideration." 22 TTABVUE 2. We will analyze the several grounds for the final refusal based on the briefing previously submitted by Applicant and the Examining Attorney, but in light of the ultimate amended identification of goods.[35]

## II.    Analysis of Grounds for Refusal

### A. The Significance of the Ultimate Identification of Goods

Applicant complains in its reply brief that the Examining Attorney has engaged in what Applicant calls "goods mutilation," 16 TTABVUE 2, because the Examining

---

[34] *Id.* (20 TTABVUE 1.)

[35] The prosecution history and the progress of the appeal are not models of efficiency and are not templates that should be repeated.

Attorney's brief "ignores throughout that Applicant applied for registration for **'Frozen confections, Ice cream, as promoted or distributed by a mascot, named SCOOP, at product promotions and distribution of Applicant's ice cream and frozen confections**,'" *id.* at 3,[36] and "Applicant's goods description is not simply for 'ice cream' as the Examiner inexplicably overlooks." *Id.* (emphasis supplied by Applicant). Applicant argues that it "does not seek to register its mark for all ice cream, but only 'as promoted or distributed by a mascot, named SCOOP, at product promotions and distributions of Applicant's ice cream and frozen confections,'" and that "[n]either the final refusal nor the Examiner's Brief contend with the actual description." *Id.*

Each of the substantive refusals requires us to apply the pertinent law to the goods identified in the application, so we will first determine the significance of the language "promoted and distributed by a mascot named SCOOP at product promotions and distributions of the frozen confections and ice creams" that was added to the original goods identification "frozen confections; ice cream." In making that determination, we find instructive the Federal Circuit's analysis of a similarly unusual clause in a goods identification in *In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744 (Fed. Cir. 2017).

---

[36] Applicant's reply brief was filed before the word "Applicant's" was deleted from the identification following the second remand. We have read all of Applicant's briefs in light of that amendment because, as noted above, Applicant's position is that the deletion of the word has no impact on the appeal.

In *i.am.symbolic*, the applicant included in its identifications of various goods in Classes 3, 9, and 14 the clause that the goods are "associated with William Adams, professionally known as 'will.i.am'."[37] The Board

> view[ed] the language "associated with William Adams, professionally known as 'will.i.am'" in [Symbolic's] identification of goods as merely highlighting an association with [Symbolic's] presumed principal, Mr. Adams. Contrary to [Symbolic's] assertion, *we do not see the language as imposing a meaningful limitation on [Symbolic's] goods in any fashion, most especially with respect to either trade channels or class of purchasers*. The language does not, in any meaningful way, alter the nature of the goods identified; nor does it represent that the goods will be marketed in any particular, limited way, through any particular, limited trade channels, or to any particular class of customers. It does not even represent that Mr. Adams will be named, or otherwise identified, in the promotion of the goods. The language "associated with William Adams, professionally known as 'will.i.am'" is *precatory language*, and not binding on consumers when they encounter Applicant's mark.

*Id.* at 1746-47 (quoting *In re i.am.symbolic, llc*, 116 USPQ2d 1406, 1410 (TTAB 2015)). The Federal Circuit agreed with the Board's interpretation of the purported limitation, holding that

> The Board . . . did not err in holding that the will.i.am restriction does not: (1) limit the goods "with respect to either trade channels or class of purchasers"; (2) "alter the nature of the goods identified"; or (3) "represent that the goods will be marketed in any particular, limited way, through any particular, limited trade channels, or to any particular class of customers."

---

[37] For example, the applicant's Class 9 identification read "sunglasses and sunglass cases associated with William Adams, professionally known as will.i.am." 123 USPQ2d at 1746.

*Id.* at 1750 (quoting the Board's opinion in *i.am.symbolic,* 116 USPQ2d at 1410). Although the Federal Circuit construed the identification in the context of a likelihood of confusion refusal, the court's analysis is useful in deciding whether the identification here "limit[s] the goods with respect to either trade channels or class of purchasers," "alter[s] the nature of the goods identified," or "represent[s] that the goods will be marketed in any particular, limited way, through any particular, limited trade channels, or to any particular class of customers." *Id.*

The language "as promoted and distributed by a mascot named SCOOP at product promotions and distributions of the frozen confections and ice creams" in the final goods identification at most specifies "that the goods will be marketed in [a] particular, limited way," *id.*, namely, through "product promotions and distributions" of the goods "by a mascot named SCOOP."[38] It does not "alter the nature of the goods identified" in any meaningful way, *id.*, or restrict the nature or type of the "frozen confections and ice creams" that are "promoted or distributed by a mascot named SCOOP at product promotions and distributions." Similarly, the identification does not "represent that the goods will be marketed . . . to any particular class of customers." *Id.* The record shows that members of the general public who consume ice cream and frozen confections are present at the "product promotions and

---

[38] The record shows that these "promotions and distributions" occur in a variety of settings, including in retail stores and restaurants, at public events such as football games, festivals, races and triathlons, farmers markets, fishing derbies, and fairs, and at media events. August 4, 2016 Response to Office Action at TSDR 49-51, 59-78, 81-92; 4 TTABVUE 40-70, 74-93, 130-34 (February 22, 2017 Request for Reconsideration (Bell Decl. ¶¶ 6-8)).

distributions" of the goods.[39] We acknowledge that the additional language in the identification specifies that SCOOP is the name of Applicant's mascot, but Applicant seeks registration of SCOOP for "frozen confections and ice cream," not live appearances by a mascot. Accordingly, notwithstanding the limitation that the goods are marketed by a mascot named Scoop at product promotions and distributions, we must assess the registrability of Applicant's proposed mark for "frozen confections and ice cream" consumed by members of the general public.

**B. Mere Descriptiveness**

Section 2(e)(1) of the Trademark Act prohibits registration on the Principal Register of "a mark which, (1) when used on or in connection with the goods of the applicant is merely descriptive . . . of them," unless the mark has been shown to have acquired distinctiveness under Section 2(f) of the Trademark Act, 15 U.S.C. § 1052(f). A mark is "merely descriptive" within the meaning of § 2(e)(1) "if it immediately conveys information concerning a feature, quality, or characteristic of the goods or services for which registration is sought." *In re N.C. Lottery*, 866 F.3d 1363, 123 USPQ2d 1707, 1709 (Fed. Cir. 2017) (citing *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1831 (Fed. Cir. 2007)). "A mark need not recite each feature of the relevant goods or services in detail to be descriptive, it need only describe a single feature or attribute." *In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 102 USPQ2d 1217, 1219 (Fed. Cir. 2012) (citation and internal quotation omitted).

---

[39] August 4, 2016 Response to Office Action at TSDR 59-63, 65-67, 70-71, 74-75, 78, 81, 83-85, 88, 90, 92; 4 TTABVUE 40-55, 60-67, 70, 80-84.

Whether a mark is merely descriptive is "evaluated 'in relation to the particular goods for which registration is sought, the context in which the mark is used, and the possible significance that the term would have to the average consumer of the goods because of the manner of its use or intended use,'" *id.*, (quoting *Bayer*, 82 USPQ2d at 1831), and "not in the abstract or on the basis of guesswork." *In re Fat Boys Water Sports, LLC*, 118 USPQ2d 1511, 1513 (TTAB 2016) (citing *In re Abcor Dev. Corp.*, 588 F.2d 811, 200 USPQ 215, 218 (CCPA 1978)). We ask "not whether someone presented with only the mark could guess what the goods or services are. Rather, the question is 'whether someone who knows what the goods and services are will understand the mark to convey information about them." *DuoProSS Meditech Corp. v. Inviro Med. Devices, Ltd.*, 695 F.3d 1247, 103 USPQ2d 1753, 1757 (Fed. Cir. 2012) (citation and internal quotation omitted).

The Examining Attorney argues that SCOOP is merely descriptive of the identified goods "because the mark conveys an immediate idea of a unit or serving of applicant's frozen confections and ice cream." 15 TTABVUE 7. She argues that "a 'scoop of ice cream' is a commonly understood serving or unit of measurement, and thus this wording merely describes the manner and portion size in which applicant's goods are served." *Id.* She cites a dictionary definition of "scoop" as "a quantity taken up by a scoop '*an apple pie with scoops of ice cream on top*',"[40] third-party uses of "scoop" to "describe a serving size of ice cream," including news articles using "scoop"

---

[40] February 15, 2018 Final Office Action at TSDR 2 (OXFORD LIVING DICTIONARIES (US English)). Another dictionary defines a "scoop" as "the amount held by a scoop <I ate a scoop of ice cream." March 11, 2016 Office Action at TSDR 21 (MERRIAM-WEBSTER DICTIONARY).

in that manner,[41] and webpages discussing how to scoop ice cream and using "scoop" to identify a serving size of ice cream.[42] *Id.* at 7-8.

Applicant makes two basic arguments as to why SCOOP is not merely descriptive of the identified goods.[43] First, Applicant argues that SCOOP is a double entendre, "a term capable of more than one interpretation." 7 TTABVUE 14 (citing TMEP § 1213.05(c)). In making this argument, Applicant effectively concedes that "scoop" has some descriptive meaning in connection with the identified goods, but claims that the applied-for mark also refers to "information of [sic] Yarnell products" or a "news 'scoop.'" *Id.*

Second, Applicant argues that "the word 'scoop' does not describe a material, or any, characteristic of ice cream nor of frozen confections." *Id.* at 16. While Applicant appears to concede that a "scoop" is a serving portion or unit of measurement of ice cream and frozen confections, Applicant claims that consumers would not "expect that some volumetric measure of either the mascot Scoop or a volume of a measuring utensil scoop itself to be given out." 13 TTABVUE 5. Applicant attributes significance to the fact that its mascot is rarely seen holding or using a scoop to serve ice cream, but typically uses a spoon for that purpose. *Id.* at 6. Applicant argues that because "a scoop is sometimes used in connection with ice cream products does not mean that

---

[41] August 26, 2016 Office Action at TSDR 17-30.

[42] March 11, 2016 Office Action at TSDR 29-36; July 17, 2017 Office Action at TSDR 15-17; February 15, 2018 Final Office Action at TSDR 3-16.

[43] A third argument, that Applicant does not seek registration for things that are "scoops" or that "scoop" foods or other materials, 7 TTABVUE 9, is of no moment. As discussed above, we must assess descriptiveness with respect to the goods identified in the application.

the term is descriptive of them" because "[m]any other goods possibly may be included within the broad term [here, scoop] but that does not make the term descriptive of all those goods.'" *Id.* (internal quotation omitted). Applicant claims that "'[a]ll goods' using a measure or scoop utensil immediately brings to the minds of consumers a diverse set of products, including coffee, pet waste, and pet litter-related products, fish, pet foods, bulk foods, cereal with raisins, or even cubed or crushed ice," *id.* at 6-7, and concludes that "[n]either a utensil nor any unit of measurement describes Yarnell's Scoop mascot or the goods associated with the mark." *Id.* at 7.

As noted above, the word "scoop" means, inter alia, a serving portion of ice cream and frozen confections. Multiple websites and articles use the word in that manner to identify a serving portion in a variety of contexts involving ice cream and frozen confections, including at retail:



---

44 February 15, 2018 Final Office Action at TSDR 12.



for counting calories:



---

[45] *Id.* at TSDR 4.

[46] August 26, 2016 Office Action at TSDR 17.



for humor:



---

[47] February 15, 2018 Final Office Action at TSDR 3.

[48] *Id.* at TSDR 22.

[49] *Id.* at TSDR 23.

and to identify ice cream parlors and ice cream shops:[50]



[51]

The record also contains multiple third-party registrations of marks for ice cream or frozen confections in which the exclusive right to use the word "scoop" or "scoops," or a design of a scoop of ice cream, has been disclaimed,[52] which are probative of the descriptive meaning of "scoop" with respect to the goods. *See, e.g., In re Box Sols. Corp.*, 79 USPQ2d 1953, 1955 (TTAB 2006).

Finally, there is evidence of Applicant's own use of the word "scoop," or a pictorial equivalent, to identify the serving portion of its goods. We reproduce two examples below:

---

[50] July 17, 2017 Office Action at TSDR 9-14.

[51] *Id.* at TSDR 9.

[52] March 11, 2016 Office Action at TSDR 11-16; August 26, 2016 Office Action at TSDR 31-62.





---

53 August 4, 2016 Response to Office Action at TSDR 74.

54 *Id.* at TSDR 97.

Some of Applicant's packaging also appears to depict Applicant's ice cream in scoops:



*See, e.g., N.C. Lottery*, 123 USPQ2d at 1709 (applicant's advertising may provide evidence of the public's understanding of a term); *Abcor Dev.*, 200 USPQ at 218 (same).

On the basis of the record as a whole, including Applicant's and third parties' uses of "scoop," we find that the applied-for mark describes "a feature, quality, or characteristic of the goods . . . for which registration is sought," *N.C. Lottery*, 123 USPQ2d at 1709, namely, that they are traditionally provided in a "scoop"-sized serving portion.

Applicant's arguments to the contrary are unavailing. Applicant's double entendre argument—that the mark also refers to information regarding its products—is unsupported by the record. Not only must "both meanings . . . be readily apparent,"

---

[55] *Id.* at TSDR 63.

but the second meaning must also be "apparent upon seeing the mark in connection with the [goods]." *In re Ethnic Home Lifestyles Corp.*, 70 USPQ2d 1156, 1159 (TTAB 2003); *see also* TMEP § 1213.05(c)).

Applicant argues that its mascot "often appears on television and social media to announce the availability of a new or returning Yarnell flavor." 7 TTABVUE 14 (citing examples). In one example, Applicant urged its Facebook followers to "like us now" to get the information:



56

This evidence does not establish a non-descriptive meaning of SCOOP. "If the alleged second meaning of the mark is apparent to purchasers only after they view the mark in the context of the applicant's trade dress, advertising materials or other matter separate from the mark itself, the mark is not a double entendre." *In re The Place, Inc.*, 76 USPQ2d 1467, 1470 (TTAB 2005);[57] *see also In re Colonial Stores Inc.*, 394

---

[56] 4 TTABVUE 72.

[57] SCOOP is not a double entendre even if a second meaning might be attributed to it in the context of extrinsic evidence of its use. *Cf. Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 128 USPQ2d 1370, 1376 (Fed. Cir. 2018) (rejecting applicant's argument that CORN THINS and RICE THINS were double entendres "conveying 'the low calorie, light[,] and diet-friendly characteristics of the products" even if "other evidence may reasonably allow one to infer a healthfulness-related meaning").

F.2d 549, 157 USPQ 382, 385 (CCPA 1968) (SUGAR & SPICE not merely descriptive of bakery products, notwithstanding the descriptive nature of the words "sugar" and "spice," because it immediately evoked the nursery rhyme "sugar and spice, and everything nice"). Applicant makes no showing that the interpretation of SCOOP as a "news 'scoop,'" 7 TTABVUE 14, is one "that the public would make fairly readily," *In re Calphalon Corp.*, 122 USPQ2d 1153, 1163 (TTAB 2017), because it is "readily apparent from the mark itself." *Id.* In the context of the goods identified in the application, the applied-for mark describes a serving size, not hot news. *See Ethnic Home Lifestyles*, 70 USPQ2d at 1158-59.

Applicant's second argument similarly misses the mark. Applicant claims that even though a serving implement called a "scoop" is sometimes used in connection with ice cream products, that "'does not mean that the term is descriptive of them" because "[m]any other goods possibly may be included within the broad term [here, scoop] but that does not make the term descriptive of all those goods.'" 13 TTABVUE 6 (bracketing supplied by Applicant). Applicant relies on *In re Hutchinson Tech. Inc.*, 852 F.2d 552, 7 USPQ2d 1490 (Fed. Cir. 1988), a case in which the Federal Circuit reversed the Board's finding that the mark HUTCHINSON TECHNOLOGY for various electronic components was primarily merely a surname under then-Section 2(e)(3) of the Trademark Act because "technology" was a broad term that did not merely describe the identified goods,[58] while affirming the requirement of a disclaimer of exclusive rights in the term TECHNOLOGY. *Id.* at 1492.

---

[58] The Federal Circuit discussed descriptiveness only in the context of whether the Board properly considered the effect that the word TECHNOLOGY had on consumer perception of

To the extent that *Hutchinson Tech.* applies outside the context of a surname refusal, Applicant's reliance on it is misplaced. Applicant essentially argues that it stands for the proposition that we must determine what is described by the word "scoop," and that "'all goods' using a measuring or scoop utensil immediately brings to the minds of consumers a diverse set of products." 13 TTABVUE 6-7. Under Section 2(e)(1) of the Act, however, the "question is not whether someone presented only with the mark could guess the goods . . . listed in the identification. Rather, the question is whether someone who knows what the goods . . . are will understand the mark to convey information about them." *In re Mecca Grade Growers, LLC*, 125 USPQ2d 1950, 1953 (TTAB 2018) (citing *DuoProSS*, 103 USPQ2d at 1757); *accord Earnhardt v. Kerry Earnhardt, Inc.*, 864 F.3d 1374, 23 USPQ2d 1411, 1413 (Fed. Cir. 2017). Accordingly, we must consider what SCOOP means to a member of the public who knows that the goods are frozen confections and ice cream promoted and distributed by a mascot named Scoop. *See Ethnic Home Lifestyles*, 70 USPQ2d at 1158-59. As discussed above, in the context of the goods identified in the application, SCOOP conveys information about their serving portion. *See generally In re Finisar Corp.,* 78 USPQ2d 1618, 1621 (TTAB 2006), *aff'd*, 223 F. Appx. 984 (Fed. Cir. 2007)

---

the surname HUTCHINSON. *Hutchinson Tech.,* 7 USPQ2d at 1492-1493. Because the Board's finding that TECHNOLOGY was descriptive was based solely on the applicant's statement that TECHNOLOGY could describe a broad array of goods, including applicant's own electronic parts, the court found the Board's finding that TECHNOLOGY was descriptive (and thus would have minimal impact on consumer perception of the surname HUTCHINSON) to be inadequately supported. *Id*. This record, in contrast, amply establishes that the word "scoop" is merely descriptive of the goods.

(distinguishing *Hutchinson Tech.* and pointing out that the term at issue in *Finisar* was shown to be merely descriptive).

Because the Examining Attorney has shown that the applied-for mark is merely descriptive of the goods, we affirm the refusal to register under Section 2(e)(1). We turn now to whether Applicant showed that the applied-for mark is nevertheless registrable on the Principal Register because it has acquired distinctiveness.

**C. Lack of Acquired Distinctiveness**

"Under Section 2(f) of the Trademark Act, matter that is merely descriptive under Section 2(e)(1) may nonetheless be registered on the Principal Register if it 'has become distinctive of the applicant's goods . . . in commerce.'" *In re Virtual Indep. Paralegals, LLC*, 2019 USPQ2d 111512, **9-10 (TTAB 2019) (quoting 15 U.S.C. § 1052(f)). "An applicant seeking registration of a mark under Section 2(f) bears the ultimate burden of establishing acquired distinctiveness." *Id.* (citing *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1264 (Fed. Cir. 2015)). "'To show that a mark has acquired distinctiveness, an applicant must demonstrate that the relevant public understands the primary significance of the mark as identifying the source of a product or service rather than the product or service itself.'" *Id.* at *11 (quoting *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1424 (Fed. Cir. 2005)).

1.  **The Degree of Descriptiveness of the Applied-For Mark**

The Federal Circuit has "long held that 'the applicant's burden of showing acquired distinctiveness increases with the level of descriptiveness; a more

descriptive term requires more evidence of secondary meaning.'" *Royal Crown Cola Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1047 (Fed. Cir. 2018) (quoting *Steelbuilding.com*, 75 USPQ2d at 1424). Accordingly, the Board "must make an express finding regarding the degree of [a] mark's descriptiveness on the scale ranging from generic to merely descriptive, and it must explain how its assessment of the evidentiary record reflects that finding." *Id.* at 1048.

The Examining Attorney acknowledges the sliding scale of proof under Section 2(f), 15 TTABVUE 10, and argues that "the evidence of record shows that applicant's mark is highly descriptive of applicant's goods." *Id.* at 11. She relies on the evidence discussed above showing use of "scoop" to identify a portion size of ice cream. *Id.* Applicant neither acknowledges the sliding scale of proof under Section 2(f), nor addresses the degree of descriptiveness of its proposed mark.

The dictionary definitions, third-party uses and registrations, and webpages and articles discussed and displayed above make it clear that "scoop" is a common portion size and measuring unit for frozen confections and ice cream. We find that "scoop" has little, if any, source-identifying capacity as a mark for those goods. Indeed, Applicant's own use confirms that SCOOP is the most apt descriptor for measuring a serving size of its goods when they are "promoted and distributed by a mascot named SCOOP at product promotions and distributions of the frozen confections and ice creams." *See, e.g.*, *N.C. Lottery*, 123 USPQ2d at 1709 (applicant's advertising may provide evidence of the public's understanding of a term); *Abcor Dev.*, 200 USPQ at

218 (same). Specifically, Applicant touts that the mascot "Scoop" will be "giving away free scoops of ice cream":



We agree with the Examining Attorney that the record as a whole shows that SCOOP is highly descriptive of ice cream and frozen confections. *See Real Foods*, 128 USPQ2d at 1374-75 (affirming Board's finding that CORN THINS and RICE THINS were highly descriptive of corn and rice cakes based on applicant's, third-party manufacturers', and the public's descriptive use of the elements combined in the claimed marks); *Virtual Indep. Paralegals*, 2019 USPQ2d 111512, at *11. We turn

---

[59] August 4, 2016 Response to Office Action at TSDR 74.

now to the issue of whether Applicant has carried its burden of showing that its highly descriptive proposed mark has acquired distinctiveness.

## 2. The Sufficiency of Applicant's Evidence of Acquired Distinctiveness

"The applicant . . . bears the burden of proving acquired distinctiveness." *La. Fish Fry Prods.*, 116 USPQ2d at 1265 (citation omitted). "The amount and character of evidence required to establish acquired distinctiveness depends on the facts of each case and the nature of the mark sought to be registered." *In re Gen. Mills IP Holdings II, LLC*, 124 USPQ2d 1016, 1018 (TTAB 2017). "[T]he greater the degree of descriptiveness the term has, the heavier the burden to prove it has attained secondary meaning." *In re Boston Beer Co.*, 198 F.3d 1370, 53 USPQ2d 1056, 1058 (Fed. Cir. 1999) (citation omitted). "Because we have found that the term [SCOOP] is highly descriptive of Applicant's [goods], Applicant's burden of establishing acquired distinctiveness under Section 2(f) is commensurately high." *Virtual Indep. Paralegals*, 2019 USPQ2d 111512, at *11 (citing cases).

> The considerations to be assessed in determining whether a mark has acquired secondary meaning can be described by the following six factors: (1) association of the trade[mark] with a particular source by actual purchasers (typically measured by consumer surveys); (2) length, degree, and exclusivity of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) intentional copying; and (6) unsolicited media coverage of the product embodying the mark . . . All six factors are to be weighed together in determining the existence of secondary meaning.

*Id.* (quoting *In re Snowizard, Inc.*, 129 USPQ2d 1001, 1005 (TTAB 2018) (quoting *Converse, Inc. v. Int'l Trade Comm'n*, 907 F.3d 1361, 128 USPQ2d 1538, 1546 (Fed. Cir. 2018))). We weigh all of the factors for which there is record evidence.

In its Initial Brief, Applicant argues that it "has presented bountiful evidence that [the mark] qualifies for registration under Section 2(f), having acquired distinctiveness for its SCOOP mascot as a human display/spokesperson for Applicant's applied-for goods." 7 TTABVUE 16. Applicant points primarily to the appearances of its live mascot at numerous public events for the five years preceding the briefing on the appeal, *id.* at 15, and claims that through those appearances, its mascot has been "extensively advertised." *Id.* at 12.[60] In its reply brief, Applicant argues that the Trademark Act "provides a *presumption* of acquired secondary meaning after five years, but no set duration is required for acquired distinctiveness under the Lanham Act or case law." 16 TTABVUE 7 (emphasis supplied by Applicant). Applicant claims that its "five years of use is presumptively sufficient under §2(f)," and that a November 2016 email from a member of the public requesting Applicant's permission to use what the email described as "Yarnells trademark" in the phrase "Getting scoops like Yarnell" on t-shirts for members of a high school football team,[61] is "supplemental evidence" of acquired distinctiveness. *Id.* at 8.

The Examining Attorney succinctly describes Applicant's proof of acquired distinctiveness as "(1) exclusive and continuous use since 2012, (2) a declaration from one individual, (3) media coverage, and (4) an email requesting permission to use the mark." 15 TTABVUE 11. She stresses that "Applicant has submitted no evidence as

---

[60] The public appearances are discussed in the Bell Declaration and listed and depicted in various exhibits thereto. 4 TTABVUE 131-32 (Bell Decl. ¶¶ 5-13; Exs. 27-39).

[61] January 12, 2018 Response to Office Action at TSDR 2-3.

to the type, expense, and amount of advertising of the mark in the United States, the applicant's sales success, or consumer studies." *Id*.

The Examining Attorney criticizes the weight that Applicant's evidence warrants. She argues that Applicant's alleged use since 2012 is insufficient to show acquired distinctiveness because Applicant's mark is highly descriptive, *id*. at 11-12, and that the Bell Declaration is insufficient because "proof of distinctiveness requires more than a declaration from one individual, especially one who works for the applicant," and because the declaration "indicates that consumers identify the term 'SCOOP' as the name of applicant's mascot," but "fails to address whether consumers perceive the term 'SCOOP' as a source identifier for the goods themselves." *Id*. at 12.

With respect to the media coverage, the Examining Attorney notes that it is "unclear from the record that these were unsolicited media events" and that "the majority of the additional submitted exhibits [reflecting the events] do not display the applied-for mark SCOOP at all," but rather show "applicant's mascot with the wording 'YARNELL'S' on its shirt, not the mark." *Id*. at 13-14. Finally, she argues that the email requesting permission to use "Yarnells trademark" is an isolated instance and that "even if consumers associate Yarnell's with the wording 'SCOOP', applicant has not proven that consumers associate the applied-for mark with applicant's ice cream." *Id*. at 14. We agree with the Examining Attorney that Applicant's evidence, taken *in toto*, does not show that SCOOP has acquired distinctiveness for Applicant's goods.

We begin with Applicant's evidence of five years' use of the applied-for mark. Contrary to Applicant's claim, the Trademark Act does not "provide[ ] a *presumption* of acquired secondary meaning after five years" of use of a mark. 16 TTABVUE 7. "Although Section 2(f) of the Lanham Act, 15 U.S.C. § 1052(f), provides that the PTO may accept five years of 'substantially exclusive and continuous' use as *prima facie* evidence of acquired distinctiveness, the statute does not require the PTO to do so." *La. Fish Fry,* 116 USPQ2d at 1265. The USPTO and the Board have discretion to find such a use claim insufficient, especially where, as here, the mark at issue is highly descriptive. *Id.; see also In re R.M. Smith, Inc.,* 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984) (affirming USPTO's decision to require more than an affidavit of eight years of continuous and substantially exclusive use); *In re Kalmbach Publ'g Co.,* 14 USPQP2d 1490, 1492 (TTAB 1989) (deeming a Section 2(f) claim of more than 10 years of use insufficient for a highly descriptive mark "without specific evidence of the extent of the mark's exposure to the purchasing public and of the purchasers' perception of the asserted mark"); *In re Synergistics Research Corp.,* 218 USPQ 165, 167 (TTAB 1983) ("we have consistently held that a declaration or affidavit of continuous and exclusive use as a mark for an extended period of years is insufficient in and of itself to support registrability under Section 2(f) of the Trademark Act where the term sought to be registered is highly descriptive in character").

Moreover, other circumstances further undercut the significance of this claim of extended use. There is scant evidence of Applicant's use of SCOOP to designate the source of its ice cream at the referenced public appearances. In its First Supplemental

Brief, Applicant concedes that its live mascot wears "a name tag with the name SCOOP" only "at some events." 13 TTABVUE 6. As discussed below in connection with the specimen refusal, the record shows only two events at which the mascot made a live appearance wearing "a name tag with the name SCOOP,"[62] and both were in retail stores rather than at one of the media events, sporting events, community events, or celebrations discussed in the Bell Declaration.[63] In the other live appearances reflected in the record, the mascot's uniform bore Applicant's house mark YARNELL'S.[64] Indeed, on this record, it is difficult to find that Applicant has used the applied-for mark continuously for five years.

With respect to the Bell Declaration, we disagree with the Examining Attorney's suggestion that proof of distinctiveness invariably "requires more than a declaration

---

[62] As discussed in detail below, Applicant claims that its specimens show that the mascot is a display associated with Applicant's goods. Under this theory, only those specimens showing the mascot in a uniform bearing the applied-for mark are relevant. There are two such specimens involving a live appearance, Applicant's original specimen submitted on November 18, 2015, and an additional specimen submitted with Applicant's Request for Reconsideration, which shows the mascot at an event in October 2015. 4 TTABVUE 133.

[63] 4 TTABVUE 131-32 (Bell Decl. ¶¶ 6-8).

[64] August 4, 2016 Response to Office Action at TSDR 59, 63-68, 70, 74-76, 78, 81-86, 87-89, 92; 4 TTABVUE 40-49, 50-52, 54-55, 57, 60, 62, 64, 66-68, 70, 74, 76, 85-94. Applicant argues that verbal references to the mascot at live appearances are evidence that the applied-for mark has acquired distinctiveness: "It is not even required that the *applicant* use the trademark if there is sufficient public association for the trademark with the source of the goods or services." 7 TTABVUE 11 (citing *Volkswagen AG v. Rickard*, 492 F.2d 474, 181 USPQ 611 (5th Cir. 1974)). The *Volkswagen* case does not aid Applicant. There, the Fifth Circuit held that the trial court properly found that the plaintiff owned a common law mark in the term BUG on the basis of the plaintiff's use of the mark "in its own advertising for many years," "public opinion surveys showing substantial public association" of BUG with the plaintiff, and the testimony of consumers and competitors that they associated BUG with the plaintiff. 181 USPQ at 614. There is no comparable supporting evidence in the record here. To the extent that verbal references to the mascot at live appearances show anything, it is that Applicant's mascot is known as Scoop. They do not show that SCOOP is recognized as Applicant's mark for ice cream and frozen confections.

from one individual, especially one who works for the applicant." 15 TTABVUE 12. The evidence here, however, is insufficient for this highly descriptive applied-for mark. Putting aside the scant evidence of use of the applied-for mark in the course of the mascot's live appearances, the Bell Declaration provides no details regarding the number of people attending, viewing, or listening to the events at which the mascot has appeared while wearing a Scoop nametag or otherwise being identified as "Scoop," including those listed in exhibits to the Bell Declaration, or the extent of public exposure to the name Scoop for the mascot through Applicant's social media. The Bell Declaration also does not state that Applicant has featured the applied-for mark and the mascot in its advertising.[65] It adds essentially nothing about whether consumers recognize SCOOP as Applicant's mark.

The record also shows some exposure of the mascot, either in person or by name, in print and electronic media.[66] There is no evidence that when the mascot has appeared on television he has worn a uniform bearing the applied-for mark and, as with the mascot's live appearances, we have no information regarding public exposure to the mascot through these media. In the circumstances presented in this case, the handful of times in which the applied-mark has appeared in print coverage

---

[65] As discussed below, two of Applicant's additional specimens show the display of a cartoon version of the mascot wearing a uniform bearing the name Scoop on Applicant's ice cream trucks. The Bell Declaration does not mention this form of use of the applied-for mark.

[66] Examples are television appearances to promote the introduction or reintroduction of various flavors, 4 TTABVUE 92-94, and articles entitled "Yarnell's returning to stores with familiar flavors" on the website at arkansasonline.com and "Yarnell's celebrates Ice Cream Day with free ice cream" on the website at thv11.com. August 4, 2016 Response to Office Action at TSDR 79-80, 86-87.

of Applicant's mascot adds little to show that SCOOP has acquired distinctiveness as a mark for Applicant's goods.

The email to Applicant requesting permission to use "Yarnells trademark" in the phrase "Getting scoops like Yarnells" is direct evidence that one consumer associated the applied-for mark with Applicant. It is unclear from the face of the email whether that association is with Applicant's mascot or Applicant's goods, but even assuming that it is the latter, we agree with the Examining Attorney that this is not a particularly weighty piece of the evidentiary puzzle.

On the basis of the record as a whole, and taking into account that the applied-for mark is highly descriptive of Applicant's goods, we find that Applicant has not provided sufficient evidence to show that the applied-for mark has acquired distinctiveness. We thus find that the applied-for mark is merely descriptive and that Applicant has not shown that it is entitled to registration under Section 2(f).

**D. Specimen Refusal**

The Examining Attorney also refused registration under Sections 1 and 45 of the Trademark Act, 15 U.S.C. §§ 1051 and 1127, on the ground that Applicant's specimens do not show use of the applied-for mark in commerce in connection with the goods identified in the application. We agree.

The Trademark Act "provides for registration of a mark based on use of the mark in commerce." *In re Siny Corp.*, 920 F.3d 1331, 2019 USPQ2d 11362, *2 (Fed. Cir.

2019).[67] The USPTO "requires an applicant to submit a specimen of use 'showing the mark as used on or in connection with the goods.'" *Id.* (quoting *In re Sones*, 590 F.3d 1282, 93 USPQ2d 1118, 1120 (Fed. Cir. 2009)); *see* 37 C.F.R. § 2.56(a). The Examining Attorney refused registration on the ground that Applicant's original and additional specimens do not show use of the applied-for mark SCOOP in commerce in connection with the goods identified in the application.

### 1. Identification of Applicant's Specimens Bearing the Applied-For Mark

Applicant's Initial Brief refers to "multiple specimens," 7 TTABVUE 10, comprising "photographs and social media Internet posts," *id.* at 11, and it discusses eight examples. *Id.* Applicant's First Supplemental Brief also discusses numerous photographs and videos depicting the mascot, 13 TTABVUE 2, 9-10, but does not address the specimen refusal per se.

The Examining Attorney discusses Applicant's original specimen, two specific substitute specimens, and "additional exhibits showing the mascot 'Scoop' appearing at various public events." 15 TTABVUE 15-16. She argues that "the majority of the additional submitted exhibits do not display the applied-for mark SCOOP at all," and that "[o]nly four exhibits show the mark on the 'Scoop' mascot or a cartoon depiction of the mascot, and none show the mark on the applicant's ice cream itself." *Id.* at 17.

Applicant responds in its reply brief that "[o]nly a single specimen is required for registration in a single trademark class," and that the fact "[t]hat some exhibits might

---

[67] The Federal Circuit originally issued this opinion as nonprecedential on January 14, 2019, but subsequently reissued it as a precedential opinion on April 10, 2019.

not qualify as use specimens does not negate others, even if a minority, that do." 16

TTABVUE 4. Applicant claims that it

> has made of record multiple specimens including: the initial specimen, Exhibit 10 (mascot in front of grocery store freezer stocked with Yarnell ice cream); Ex. 13a (holding ice cream, in front of grocery store dairy shelves); Ex. 15a (cartoon named Scoop, showing both "Yarnell" and "Scoop" on the mascot, with face cutout for photos, attached to Yarnell ice cream truck); Ex. 15b (cartoon Scoop mascot on side of ice cream truck, showing "Scoop," on the mascot's cap and shirt); Ex. 15c (close-up of ice cream truck with cartooned Scoop mascot, showing "Scoop" on the mascot). Further, the word SCOOP is manifest in Exhibits 10, 13a, 15a, 15b and 15c [and] Exhibit 16 (a video with audio) loudly shows recognition of mascot as both "Scoop" and as an agent for Yarnell. . . . [T]he trademark SCOOP appears on more than Applicant's mascot's shirt, it also appears on Applicant's ice cream truck, and on a photo backdrop adjacent to Applicant's ice cream truck. . . . Applicant's original use specimen . . . well meets all legal requirements, as do each of the other five specimens.

*Id.* at 4-5.

The applied-for mark appears only on the shirt worn by Applicant's human or cartoon mascot,[68] and it is visible in that manner in the additional specimens a total of four different times.[69] We will consider the original specimen and these four additional specimens that bear the applied-for mark.

---

[68] As noted above, in the vast majority of depictions of the live mascot, his shirt bears Applicant's YARNELL'S house mark rather than the applied-for mark.

[69] August 4, 2016 Response to Office Action at TSDR 91, 95-96; 4 TTABVUE 133. The mascot's shirt in the video discussed by Applicant appears to bear the YARNELL'S mark. The mascot is referred to verbally as "Scoop" by a person who introduces him.

### 2. The Sufficiency of Applicant's Specimens

"A mark is deemed in use in commerce on goods when, among other things, 'it is placed in any manner on the goods or their containers *or the displays associated therewith* or on the tags or labels affixed thereto.'" *Siny*, 2019 USPQ2d 11362, *2 (quoting 15 U.S.C. § 1127). The record shows that marks for ice cream and frozen confections are typically affixed to the containers for those goods, in the manner in which Applicant's original specimen displays its YARNELL'S mark:



Applicant argues that it uses the applied-for mark on displays associated with its ice cream and frozen confections, rather than on their containers. Applicant made of record multiple examples of what it describes as "[t]ypical displays associated with the goods." 7 TTABVUE 11 (citing TMEP § 904.03(g)). We depict one below:


[70]

Applicant's claimed displays take two forms: (1) a live mascot wearing a shirt bearing the word "Scoop," who makes personal appearances "at product promotions and distributions of the frozen confections and ice creams," and (2) Applicant's ice cream trucks displaying a cartoon version of the mascot wearing a shirt bearing the word "Scoop," which are parked at such product promotions and distributions.

With respect to the first form, Applicant cites no case in which a live person has been found to be a "display associated with" goods,[71] and we have found none.

---

[70] August 4, 2016 Response to Office Action at TSDR 111.

[71] Applicant analogizes the uses of its live mascot as a display associated with its goods to the use of the BEANIE mascot of the city of Lima, Ohio, 7 TTABVUE 11-12; 16 TTABVUE 6, and the use of other product spokespersons. 13 TTABVUE 4; 16 TTABVUE 6. Applicant made of record information from the TESS database regarding registrations of the BEANIE word mark for t-shirts and baseball caps, 4 TTABVUE 31-33; the Beanie design mark for lapel pins, various printed materials, and t-shirts, *id.* at 34-36; and the marks THE MOST INTERESTING MAN IN THE WORLD for beer, August 4, 2016 Response to Office Action at TSDR 25-26, HEY CULLIGAN MAN! and CULLIGAN MAN for servicing water treatment equipment and related services, *id.* at TSDR 33-34, 36-37, and THE BURGER KING and design for birthday party services and restaurant services. 4 TTABVUE 20-21. These registrations show that product-related characters can function as marks for goods and services, but because Applicant did not include the specimens of use that supported these registrations, we do not know whether the registrations issued on the basis of specimens

"'Section 45 of the Trademark Act does not define the term 'display associated therewith,'" *In re Kohr Bros., Inc.*, 121 USPQ2d 1793, 1794 (TTAB 2017) (quoting *In re Shipley Co.*, 230 USPQ 691, 692 (TTAB 1986)), but Applicant acknowledges that "[t]ypical displays associated with the goods are point-of-sale material such as banners, shelf-talkers, window displays, menus, and similar devices." 7 TTABVUE 11 (citing TMEP § 904.03(g)). This category of "point-of-sale material" cannot easily be stretched to conclude that humans making live personal appearances at an event or venue are "similar devices" to banners or window displays. The TMEP's discussion of displays associated with the goods suggests, at the very least, that Applicant's theory tests the limits of what the word "displays" in the statute can reasonably be understood to mean.

Nevertheless, the Board "must make a case-by-case determination of whether a particular use asserted to be a 'display' is adequate to demonstrate use in commerce,'" *Kohr Bros.*, 121 USPQ2d at 1794 (quoting *Shipley Co.*, 230 USPQ at 692), and our primary reviewing court has "cautioned against bright-line rules in this context." *Siny*, 2019 USPQ2d 11362, *3. Accordingly, while we do not foreclose the possibility that a human being making a live personal appearance at an event or in a venue can qualify as a "display associated" with the goods within the meaning of Section 45 of the Trademark Act, we find on this record that neither the live mascot nor his cartoon counterpart so qualify.

---

comprising displays associated with the goods, or on the basis of some other use of the character marks.

"'A display used in association with the goods is essentially a point-of-sale display designed to catch the attention of purchasers as an inducement to consummate a sale.'" *Kohr Bros.*, 121 USPQ2d at 1795 n.5 (quoting *In re U.S. Tsubaki, Inc.*, 109 USPQ2d 2002, 2003 (TTAB 2014)). An important "'factor in the analysis of whether a specimen is an acceptable display used in association with the goods is whether the mark is displayed in [ ] . . . such a way that the customer can easily associate the mark with the goods.'" *Kohr Bros.*, 121 USPQ2d at 1795 (quoting *In re Osterberg*, 83 USPQ2d 1220, 1223 (TTAB 2007)). A display "'must be designed to catch the attention of purchasers and prospective purchasers as an inducement to make a sale," and "must prominently display the mark in question and associate it with, or relate it to, the goods.'" *Kohr Bros.*, 121 USPQ2d at 1795 (quoting TMEP § 904.03(g)).

Applicant argues that "[t]he word SCOOP is manifest" on its ice cream trucks "in text." 7 TTABVUE 13. We disagree. As shown below, the applied-for mark is not particularly noticeable, much less eye-catching, when it appears on Applicant's trucks bearing the cartoon mascot:



<sup>72</sup>

---

<sup>72</sup> 4 TTABVUE 134. Applicant described this specimen as a "photo backdrop adjacent to Applicant's ice cream truck." 16 TTABVUE 5.


[73]

The mere fact that the applied-for mark appears in proximity to the goods is not enough to show that these specimens constitute displays associated with the goods. *Kohr Bros.*, 121 USPQ2d at 1794-95. The applied-for mark is visually subordinate on Applicant's trucks to the YARNELL'S house mark, which appears in lettering that is much larger and more prominent than the relatively small script in which the applied-for mark appears on the "uniform" of the cartoon character. The word "Scoop" that appears on the uniform is used as, and thus is likely to be perceived as, the name of the cartoon character himself, rather than as a mark identifying the goods. The goods are identified by the mark YARNELL'S that appears in large lettering elsewhere on the specimens as "Yarnell's Premium Ice Cream." The specimens do not display the applied-for mark in "such a way that the customer can easily associate the mark with the goods." *Id.* at 1795; *cf. In re Duvernoy & Sons, Inc.*, 212 F.2d 202,

---

[73] 4 TTABVUE at 96. The cartoon mascot alone is reproduced elsewhere in the record. *Id.* at 97.

101 USPQ 288, 289 (CCPA 1954) ("[W]e think it is clear from the exhibits that Duvernoy & Sons, Inc., appellant's trade name (generally shown in large, fanciful letters), is relied upon to denote origin and that 'Consistently Superior' is merely an adjunct thereto, operating in the shadow thereof, to indicate to purchasers that appellant's goods are always superior in quality.").

Applicant's original specimen, and one of its additional specimens shown below,



[74]

show the live mascot appearing in stores in which we assume Applicant's ice cream can be purchased by a consumer after he or she receives a free promotional sample. The store is clearly "a point-of-sale location," *Siny*, 2019 USPQ2d 11362, *3, but we find that the specimens showing the live mascot do not constitute a display associated with the goods. When the applied-for mark appears on the live mascot's uniform as a nametag, it identifies, and is associated with (in the words of Applicant's goods

---

[74] 4 TTABVUE 133.

identification) "a mascot named SCOOP," not the goods that he promotes and distributes. The association of the applied-for mark with the mascot, not the goods per se, is reinforced by the fact that when he makes personal appearances, "Scoop is generally introduced by his mascot name, 'Scoop,' often excitedly." 4 TTABVUE 131 (Bell Decl. ¶ 6). The record as a whole shows that the mascot is identified and referred to as "Scoop" whenever he appears, including in the vast majority of cases where his "name" does not appear on his uniform.

Applicant argues in its reply brief that the fact that "a consumer may associate one trademark with a company does not preclude another mark." 16 TTABVUE 7. We agree. Indeed, it has long been "settled that a product label or in the case of a service mark, an advertisement or similar material can bear more than one mark without diminishing the identifying function of each." *In re Morganroth*, 208 USPQ2d 284, 287 (TTAB 1980). But "the salient question is whether the designation in question, as used, will be recognized in itself as an indication of origin for the particular product or service," *id.*, and the specimens here do not show that SCOOP will be "recognized in itself as an indication of origin" for Applicant's ice cream and frozen confections, rather than simply as the name of Applicant's live or cartoon mascot.

We add that three of Applicant's specimens suffer from the additional defect that they do not appear to have a point-of-sale nature, or to be "calculated to consummate a sale." *U.S. Tsubaki*, 109 USPQ2d at 2009. "In determining whether a specimen qualifies as a display associated with the goods, one important consideration is

whether the display is at a point-of-sale location." *Siny*, 2019 USPQ2d 11362, *3 (citing *Sones*, 93 USPQ2d at 2009). "Mere advertising is not enough to qualify as such a display," *id.*, and "to be more than mere advertising, a point-of-sale display associated with the goods must do more than simply promote the goods and induce a person to buy them; that is the purpose of advertising in general. The specimen must be 'calculated to consummate a sale.'" *U.S. Tsubaki*, 109 USPQ2d at 2009 (quoting *In re Bright of America, Inc.*, 205 USPQ 63, 71 (TTAB 1979)); *see also* TMEP § 904.03(g) ("These items must be designed to catch the attention of purchasers and prospective purchasers as an inducement to make a sale").

One of the specimens is a still image of the live mascot from what appears to be a 23-second video in which the mascot apparently encourages fans of the University of Arkansas Razorbacks to "PIG OUT!":



---

[75] August 4, 2016 Response to Office Action at TSDR 91.

Applicant did not make the video itself of record. There is no evidence that the goods may be purchased using information provided in the video. *Cf. In re Hydron Techs., Inc.*, 51 USPQ2d 1531, 1533-34 (TTAB 1999) (holding that a 28:45 infomercial for skin care products was a display associated with the goods where the goods were shown either immediately before or immediately after the applied-for mark was displayed in the video, and information enabling viewers to order the goods was given in a reasonable time after the goods were shown).

The two other specimens display some variant of the cartoon mascot on one of Applicant's trucks used to distribute ice cream at Applicant's "product promotions and distributions." Assuming, without deciding, that these specimens pertain to the identified goods as "promoted and distributed **by a mascot named SCOOP**" (emphasis added), there is nothing on the face of the additional specimens indicative of a point-of-sale nature, such as a price list, and Mr. Bell's declaration is silent with respect to the trucks.[76] We cannot find on this record that the substitute specimens were used "at a point-of-sale location," *Siny*, 2019 USPQ2d 11362, *3, or were "calculated to consummate a sale." *U.S. Tsubaki*, 109 USPQ2d at 2009. *Cf. Shipley Co.*, 230 USPQ at 693-94 (display of mark at trade show where consumers could order the goods held to be a point-of-sale display associated with the goods).

---

[76] He focuses on the live mascot, who "usually appears in proximity to Yarnell ice cream and frozen confections" and "often distributes Yarnell ice cream and frozen confections." 4 TTABVUE 131 (Bell Decl. ¶¶ 9-10).

Because Applicant did not submit specimens showing use of the applied-for mark in commerce in connection with the identified goods, we affirm the refusal to register on that ground.

### E. Failure to Function Refusal

"[A] proposed trademark is registrable only if it functions as an identifier of the source of the applicant's goods or services." *In re DePorter*, 129 USPQ2d 1298, 1299 (TTAB 2019) (citing 15 U.S.C. §§ 1051, 1052, and 1127). "The Trademark Act is not an act to register mere words, but rather to register trademarks. Before there can be registration, there must be a trademark, and unless words have been so used they cannot qualify.'" *Id.* (quoting *In re Bose Corp.*, 546 F.2d 893, 192 USPQ 213, 215 (CCPA 1976)). There are multiple reasons why a proposed mark may fail to function as one. *See generally* TMEP § 1202 (Oct. 2018).

The Examining Attorney argues that the applied-for mark SCOOP fails to function as a mark because consumers would perceive it is as "merely conveying an informational message and not as a means to identify and distinguish the applicant's goods from those of others." 15 TTABVUE 4. She thus invokes the line of cases holding that "terms and expressions that merely convey an informational message are not registrable." *DePorter*, 129 USPQ2d at 1299 (citing *In re Eagle Crest*, 96 USPQ2d 1227, 1229 (TTAB 2010)). The Examining Attorney points to the evidence discussed above regarding the descriptiveness of SCOOP as a serving size of the goods, and claims that "because consumers are accustomed to seeing 'SCOOP' used in this manner, they would immediately perceive this term as merely informational

matter indicating that the applicant offers servings of ice cream or frozen confections." *Id.* She also argues that "the applied-for mark, as used on the specimen of record, does not function as a trademark because it does not identify the goods of the applicant and distinguish them from the goods of others, nor does it serve to indicate the source of applicant's goods." *Id.* at 5.

Applicant argues that "consumers actually do perceive Applicant Yarnell as the source of the mascot Scoop as well as the goods the mascot promotes." 13 TTABVUE 4. Applicant points to the email discussed above and the fact that the mascot "is constantly in immediate proximity to Applicant's name and its goods" and "is always in uniform, bearing the Yarnell name on his hat, and often the Yarnell name on his uniform shirt" when the mascot makes live appearances. *Id.* Applicant claims that the "cases cited in the final refusal, [*Eagle Crest*], *In re Aerospace Optics, Inc.*, 78 USPQ2d 1861 (TTAB 2006), and *In re Hulting*, 107 USPQ2d 1175 (TTAB 2013), thus do not support refusal." *Id.*

Many of the Board's failure-to-function cases have dealt with phrases in the American vernacular that were found to be incapable of functioning as marks due to their nature. See, e.g., *Hulting*, 107 USPQ2d at 1177 (affirming refusal to register "No More RINOs!" (short for "No More Republicans in Name Only") for clothing and other goods); *Eagle Crest*, 96 USPQ2d at 1232 (affirming refusal to register "Once a Marine, Always a Marine" for clothing because it would be perceived as an informational slogan "to express support, admiration or affiliation with the Marines"); *In re Volvo Cars of N. Am., Inc.*, 46 USPQ2d 1455, 1460-61 (TTAB 1998)

(affirming refusal to register "Drive Safely" for automobiles because it would be perceived as an everyday, commonplace safety admonition); *D.C. One Wholesaler, Inc. v. Chien*, 120 USPQ2d 1710, 1716 (TTAB 2016) (sustaining opposition to registration of I ♥ DC for clothing because it would be perceived as "an expression of enthusiasm, affection or affiliation with respect to the city of Washington, D.C.").[77] SCOOP is not such a phrase, but a single word may fail to function as a mark if it does not identify and distinguish an applicant's goods or services.

In *Aerospace Optics*, the Board found that the word SPECTRUM did not function as a mark for "pushbutton switches with dimmable illumination for use in military and civilian aircraft cockpits, aviation crewstations, ships and command, communications, control and intelligence systems" "because of the informational nature of the term, but also because of the way it appears on the specimen." 78 USPQ2d at 1864. The Board found that the word "spectrum" meant a "continuum of color formed when a beam of white light is dispersed (as by passage through a prism)

---

[77] *Cf. In re Helena Rubinstein, Inc.*, 410 F.2d 438, 161 USPQ 606, 609 (CCPA 1969) ("The specimens of record disclose that 'PASTEURIZED' appears in association with the internationally well-known name 'Helena Rubinstein.' Such concurrent usage would, in our judgment, be emanative of the conclusion that the ordinary purchaser would not consider the mark indicative of the origin of the goods. . . . It seems to us that the marks speak irrefutably for themselves that appellant's face creams are pasteurized or substantially so, and are clearly so descriptive of the goods as to be incapable of distinguishing them from the goods of others."); *In re J. Hungerford Smith Co.*, 279 F.2d 694, 126 USPQ 372, 373 (CCPA 1960) ("On both specimens 'J. Hungerford Smith's' and 'J H S' appear in the largest lettering. The first specimen bears in smaller letters additional words 'Imitation Burgundy Cherry Syrup,' while the second bears the words 'Cream-Pak Brand Burgundy Cherry Flavoring Syrup' with 'Reg. U. S. Pat. Off.' appearing beneath the quoted word 'Burgundy.' . . . Use of the words 'Cream-Pak Brand' in addition to 'J. Hungerford Smith's' serves as a further indication that 'Burgundy' is not used in the sense of a trademark for the syrup. We agree with the Patent Office that, so far as the record shows, appellant has not used 'Burgundy' as a trademark for a soft drink syrup, but only as a flavor designation.") (paragraph break eliminated).

so that its component wavelengths are arranged in order," *id.* at 1863-64, and that as the mark was used on the specimen of record, "the applied-for mark merely informs the potential purchaser of an aspect of the goods, namely, the multiple color feature." *Id.* at 1864.

As discussed above, the applied-for mark is merely (and highly) descriptive of "ice cream and frozen confections promoted and distributed by a mascot named SCOOP at product promotions and distributions of the frozen confections and ice cream," and it does not serve as a source indicator as it is depicted on the specimens of record. Our findings in connection with these refusals establish that SCOOP also fails to function as a mark for the identified goods because, at most, it merely informs purchasers of the serving size of the goods. *Id.* Accordingly, we affirm the refusal on that ground.

**Decision**: The refusal to register is affirmed.